O’Neall, J.
delivered the opinion of the Court. arreste(l i>y virtue of a ca. set. issued at the instance plamthfi under a recovery, had by her against defendant for malicious prosecution; he gave bond to the sheriff for the prison rules on the 14th of he applied to be discharged under the íí _4ct to establish the bounds of the prisons or common gaols m the several districts and counties of this State,” and on the 20th of October, filed in the office of the Clerk, a schedule, purporting to be of his whole estate, but it was not sworn to until the 29th of Octo-bers when he applied to the commissioners of special bail for an order for his discharge, who permitted him then t° amend it by adding an account against James Henderson, which had been put in suit against his but a recovery was not had thereon. The defendant, on the 12th of October, was also arrested The defendant on the 5th of September, 1832, was *119 by a ca. sa. at the suit of Robert Catheart; he gave bond to the sheriff on the same day, and on the 13th of October, filed in the office of the clerk, a schedule of his whole estate, and on the 22nd of October, assigned it to the said Robert, and was discharged from arrest under his ca. sa. Cathcart’s judgment and fi. fa. were elder than the plaintiffs’. A part of Bj'igg’s estate assigned to Catheart, were choses in action to a large amount, more than enough to satisfy the plaintiffs’ demand. Upon appearing before the sioners of special bail, the plaintiff objected to the fendant’s discharge, upon the grounds, 1st, that a schedule on oath or affirmation of the defendants’ whole estate, or of so much as would pay and satisfy the sum due on the plaintiffs’ execution, ought to have been rendered to the Clerk, within forty days from his arrest. 2nd, That it was not rendered within forty days from the date of his bond. 3rd, That the defendant had since his arrest assigned his estate to one creditor, Robert Catheart, in preference to another, the plaintiff. 4th, That the defendant was confined for ful and malicious trespass. 5th, That the defendant’s schedule was false, inasmuch as it did not include a large real estate, belonging to the defendant, in the Territory of Florida, in the district of Beaufort, and the town of Camden in this State — 28 or 29 slaves — a quantity of household furniture, and cash on hand at his arrest. The commissioners of special bail declined deciding on these various grounds ; and referred the parties to the Court of Common Pleas, for Newberry district, for a decision of the same. — ■ The plaintiff filed a suggestion, embracing the grounds made before the commissioners of special bail, to which the defendant pleaded, and issue was joined'. The case was heard at Newberry, November Term, 1832, before Mr. Justice Gantt. In addition to the facts already stated, it appeared from statements of the defendant, that he was at one time the owner of a large real property in Florida; within a year before the trial he told the witness that he had disposed of it. It was proved by the present and former tax collector, *120 Liat Lie defendant paid taxes for tbe last year, and several preceding ones, for 11 or 1200 acres of land in the district of Beaufort, and a town lot in Camden. The defendant shortly before his arrest, sent away a parcel of trunks, containing the clothes of his deceased wife and children, some bed clothes, and a quantity of glass ware. The twenty eight or twenty nine negro slaves mentioned in the suggestion, were sold in 1829 by Mr. Carwile, then the sheriff, under the execution of Robinson v. Briggs, which had been assigned to Abram D. Jones; he became the purchaser, and suffered the negroes to return into the possession of Briggs, who paid taxes for them, and worked them as before, in his crops until August or September last, when the sheriff sold the defendant’s real estate in Newberry district, and the rest of his negroes, and all of his visible property which could be found, and Jones was the purchaser. In relation to the land in Beaufort, the defendant gave in evidence an exemplification of a decree in equity, shewing, as I understand, that a deed from John Briggs, the brother of the defendant, to some person, other than the defendant had been set ■aside. As to the town lot in Camden, he gave in evidence a deed from Wm. and Sarah Lang, to Benjamin Carey, dated 16th August, 1787. The defendant it also appeared, had been advised by his counsel, that it was not necessary to be sworn to his schedule when filed, and that this was the practice of the clerk, in whose office it was filed.
maiidou"prosé-totuetenémor *ocunds
piles’ for a E-‘ost^Snaeí” tío' prop-ea i/haTs'che-fof it“£ to show that the Mtpewongd°to
*120 The presiding judge held, that it was not necessary that the schedule should be rendered to the clerk, within forty days from the arrest of the defendant, but within forty days from the execution of his bond ; that the filing of the schedule within, and swearing to it, after forty days, was a compliance with the requisition of the act. That the assignment to Cathcart was not an undue preference of one creditor to another; and that the plaintiff would be entitled, under a just construction of the prison bounds act, to a share of the property assigned to him : Thai the defendant was not confined for wilful and malicious trespass : That *121 the admissions of the defendant, that he owned other property than that contained in his schedule, and paying taxes for the same, was no evidence to shew that he had title thereto — That the defendant was divested of title to the slaves by the sale made by sheriff Carwile ; and that it was incumbent on the plaintiff, to shew that Briggs had again acquired' title thereto, in order to falsify his schedule in this respect. Under this view of the law, the jury found for the defendant; a motion was then made for the discharge of the defendant, but the plaintiff having served the presiding judge with notice of appeal on all the grounds of objection made by the suggestion, the presiding judge refused to discharge him. The appeal presents for our consideration and judgment, all the grounds of objection originally made to the defendant’s discharge, and in connection with, and as a part of the 5th ground, it will be necessary to consider the effect of the defendant’s admissions of the payment of taxes ; and also of his possession of the slaves sold by sheriff Carwile to Jones. I will proceed to consider them in the order in which they have been already stated.
r. l. 436.
1. The third section of the “ Act to establish the bounds of the prisons or common gaols in the several districts and counties of this State” provides that, “all prisoners in execution on any civil process, who are or shall be committed to the custody of any or either of the sheriffs of the districts or counties of this State, shall be entitled to the benefit of the said rules, bounds or limits, provided he or she shall, within forty days after being taken in execution, give satisfactory security to the sheriff of the district or county, where he or she may be confined, (for the solvency of which security the sheriff shall also be answerable) that he or she will not only remain within the said rules, bounds or limits, but will also within forty days, render to the Clerk of the Court in the district or county where he or she shall be confined, a schedule on oath or affirmation (agreeable to the form of his or her religious persuasion) of his or her whole estate, or of *122 s0 much thereof, as will pay and satisfy the sum due on the execution by force of which he or she shall be confined.” The construction now contended for, by the plaintiff, arises out of the loose wording of the proviso contained in this section. For if we were obliged in the interpretation of it, to give it a literal construction, there might be great difficulty in avoiding the conclusion, that the schedule must be rendered, as well as the bond executed, within forty days after the arrest. But I am satisfied that it was not intended that the schedule should be filed within forty days after the arrest. The previous part of the proviso in directing within what time security may be taken for the rules, is very explicit in declaring that it must be within forty days after being taken in execution; if it had been intended that the schedule should be rendered within the same time, the same expressions would have been used, and the proviso in the part immediately under consideration, would have been made to read “bat will also within forty days” after being taken in execution “render to the Clerk of the Court” &c. The expressions “after being taken in execution” having been used in a previous member of the proviso, and being dropped in this, it is fairly to be concluded that they were not intended to qualify the sense and meaning of the words used in it. Read the proviso leaving out the words “within forty days after being taken in execution,” and it will then stand thus: “Provided he or she shall give satisfactory security to the sheriff of the district or county, where he or she may be confined, (for the solvency of which security the sheriff shall also be answerable) that he or she will not only remain within the said rules, bounds or limits, but will also, within forty days render &c.” There can be no doubt if it had been so worded, that the schedule must be rendered within forty days from the time of the giving of the security. For it is one of two covenants, which the defendant in execution, and his securities, make with the sheriff; the first is, that the defendant shall from that time remain within the rules, bounds or limits; the second is, that he shall within forty *123 days render &c. Within forty days from when? is the natural question. The answer must be from the day on which he and his securities have undertaken that' he shall do the act. The previous covenant aids to fix the time ; for until the security is given, he is not entitled to the bounds, and when given, he must from that day remain within them, until legally discharged. So too, he is under no legal obligation to render a schedule until his bond is given, then his liability to do the act, commences, and from the commencement of the liability we must compute the time within which it is to be done. These reasons are satisfactory to shew, that if the proviso had been framed as 1 have suggested, that the construction must have been that the schedule should be rendered within forty days from the giving of the security. That the proviso, to ascertain what is meant in this respect, should be read leaving out the words “within forty days after being taken in execution” or that they should be considered parenthetical, is, I think, obvious. They are used merely to designate the time within which security may be given, and not what the security guarantees shall be done. They are directory to the sheriff, and when they have performed their duty in this respect, they have no longer any office to perform. The part of the proviso relating to the time within wrhich the schedule shall be rendered, has, as far as my knowledge of the practice under it extends, uniformly received the construction which I have given to it. All the bonds for the bounds, are taken with the condition that the defendant shall, within forty days from the date, render to the clerk &c. This uniformity of practice under the proviso, would, unless there was something directly to the contrary in it, so sanction the construction which has been heretofore given to it, as to prevent us from adopting a different one.
2. The words of the proviso are, “but will also within forty days, render to the Clerk of the Court of the district or county, where he or she shall be confined, a schedule on oath or affirmation.” To be a compliance with the plain and intelligible words and meaning of *124 Pai‘t; the schedule to be rendered to the clerk within forty days after the execution of the bond, must be on oath or affirmation. Until rendered under this sanction, the plaintiff may treat any schedule filed in the Clerk’s office as blank paper. This was conceded in the argument; but it was supposed that the practice of the clerk, in whose office this schedule was filed, and the fact that the defendant in this respect acted under the advice of counsel, would authorize the Court, now to receive the schedule. But neither can have this effect. The practice of the clerk, (who has long been an honor and ornament of his district, for his virtues, as well as for a correct discharge of his official duties,) although erroneous; fiad its origin in the best of motives. The practice of allowing amendments to be made after a schedule was filed and sworn to, seemed necessarily to be an implied admission, that there had been a false swearing on the part of the defendant. To avoid this, the schedule was received without oath, and the defendant allowed to perfect it at any time anterior to his discharge, when the oath was administered. This, in nine cases out of ten, could not operate any prejudice. For if the schedule was filed in nine or ten days after the bond was executed and notice given of the application for the benefit of the act, the completion of the schedule and the party’s discharge would be within the forty days, if an objection even was made and the party was thus driven to the necessity of publishing a new notice. It is only in cases like the present, where the defendant speculates upon the advantages of delay to the very last moment of time allowed him, that any injury can result from the practice. But it does not belong to the clerk to establish a rule in this respect : it is the business of the defendant to see that he has complied with the law in rendering in his schedule; if he has failed in any respect, he must take the consequences. It is not even the duty of the clerk to swear the defendant to his schedule, he must render it to him on oath. That is, when lie presents it to be filed, it must be sworn to. The oath can be adminis *125 tered to him by any justice of the peace : the clerk, may administer the oath, but I see nothing in the act which compels him to do so. He is not required to see that the defendant’s schedule is perfect when rendered, he is not even required to open and read it.— It is the defendant’s own act, to entitle himself to a discharge under the act. But if it was the clerk’s duty to see that the schedule was sworn to, and he had adopted the practice of dispensing with the oath at the time when filed, it could not have had the effect to engraft his error upon the provisions of the act. No matter how erroneous a practice may be, and no matter how inveterate it may be, it cannot alter an express enactment. The mistaken view of the defendant’s counsel, of the law, cannot aid him. For there is a great difference between the effect of a mistake of counsel in relation to a positive law, and the practice of the Courts. The former is a rule, over which the Court has no power; the latter is purely a matter of convenience established by the Court, and regulated by its discretion. In the one, it cannot relieve for a mistake of counsel, because it is the expositor, not the maker of the rule ; in the other, it is both, and may therefore relieve in the exercise of a sound discretion. The case of Crovat and wife v. Coburn, 3 M’C. 14, trenches I must acknowledge upon this reasoning; but notwithstanding its authority upon the point decided, I cannot yield the positive words of an act of the legislature to any exposition contrary to its express words. I do not intend to shake the authority of that case upon the point decided by it, but all I now mean to say, (because that is all now necessary to be said,) is that I would not suffer it by analogy to carry us any farther in an invasion on the words of the act. In that case, the defendant was within the rules of a prison which did not extend to the Clerk’s office, and she could not therefore personally render to the clerk her schedule. An agent was necessary to do the act, and an attorney was her legal agent for its performance. His sickness prevented it being done, and the question was, whether a judge might permit it to be done *126 nunc „)T0 func . and it was held that be might. There -r . , . 1*1 i* /y» are three circumstances in that case which are difter-ent from this. 1st, That in it, there was an impossibility on the part of the defendant, to do in person, the act required by the law. In this case such is not the fact. The Clerk’s office is within the rales. 2nd, The schedule in that case was complete, so far as the defendant could act, “the schedule had been prepared in time.” In this case the schedule was not prepared in time ; for the defendant did not swear to it, until after the time allowed for it to be rendered to the clerk had expired. 3rd, That was an application to render or file it nunc pro tunc, which the Court regarded as addressed to its discretion ; and when granted, the effect of the order was to put the schedule in the Clerk’s office within the proper time, and nothing would appear on its face to shew that it was not. In this ease no such application was made, and the fact that the schedule was not sworn to until after the expiration of the time allowed by law, appears on its face. We are now called on to say, not whether the defendant might have been sworn on the day on which he was, nunc pro tunc, but whether this schedule sworn to, after the expiration of forty days from the execution of the bond, is a compliance with the act. These striking differences between the case under consideration and that of Crovat v. Coburn, are enough to shew that the latter cannot control our decision in this. I am therefore satisfied that the schedule until sworn to, must be regarded as if none had been rendered, and that being sworn to, after the expiration of forty days from the execution of the bond, it was not rendered within the time required by the act.
r. l. 457.
3d. The seventh section inter alia, provides that no prisoner shall be discharged, “who shall have, three months before his or her confinement, or at any time since, paid or assigned his estate, or any part thereof, to one creditor in preference to anotherand in a subsequent part, it is provided that, “wherever a prisoner shall be accused by the plaintiff or his agent, of fraud, or of his having given an undue preference, to the *127 prejudice of the plaintiff&e. Taking these two parts of the seventh section together, it has been held in the case of Creyton & Sloan v. Dickerson, 3 M’C. 438, that a payment by a prisoner in execution, to be such an one as would deprive him of the benefit of the act, must be an undue preference to the prejudice of the plaintiif. This construction is, I think, perfectly correct, notwithstanding what is said to the contrary, in the case of Stover v. Duren, 2 M’C. 266: it proceeds, however, upon what appeared in that case to be the fact, that the defendant made the payment without any view of postponing, or hindering the plaintiff from the collection of his debt. In other words, the payment must be bona fide, and must not be of such a portion of the defendant’s estate, as would show that he intended to pay one, in exclusion of all others. The rule of Creyton & Sloan v. Dickerson, will apply to eases of assignment. • It is true, that an assignment of the debtor’s estate, which will deprive him of the benefit of the act, must be his own voluntary act, and not by operation of law. But if a party takes advantage of legal process, to give an undue preference, by making under it, an assignment, it would be as much the debtor’s fraud, as if it had been done without the intervention of process. The question of undue preference, in the case under consideration, depends upon the fact, whether the defendant was compelled by law, to make an assignment to Cathcart, in preference to the plaintiff? For, that the assignment to him is a preference, and if made voluntarily, and without legal compulsion, is an undue one, is, I think, demonstrable. His judgment and execution are older than the plaintiff’s ; and if he had been content to rely on them, without resorting to a ca. sa., their lien on the visible property of the defendant, would have been paramount to any interest which the plaintiff could have acquired by an assignment. But a considerable part of the defendant’s estate, assigned to Cathcart, consisted of dioses in action, on which neither Ms judgment nor execution created a lien.— As to them, the plaintiff and Cathcart stood in equal *128 rights : (see the the case of Harth v. Gibbes, 4 M’C. 8;) and in them, the defendant could not, within three months before his arrest, or after it, give to either an undue preference. By an undue preference, I understand such an intentional preferring of one creditor, as may enable him to receive payment, and altogether defeat, delay or hinder another from being paid. This is the effect of the assignment of the choses in action, to Cathcart, it gives to him all the debtor’s means of payment, and thus defeats the plaintiff altogether. But it is not only in relation to the c.hoses in action, that the assignment is a preference, it is so, likewise, in relation to the defendant’s visible property. The case of Cohen v. Grier, 4 M’C. 509, decides that the arrest of the body, under a cm. sa. is a discharge of the lien of the fi. fa.\n the same case. I am not disposed to think, that the rule is quite as broad, as that case states. For, an arrest of the body under a ca. sa. is not an absolute satisfaction of the debt. It is during the continuance of the imprisonment of the defendant, a suspension of every other remedy by execution, of the creditor, and is, of course, during the same time, a suspension of his liens. For the law presumes, the plaintiff will be satisfied by the body of his debtor. If this is correct, at the time the assignment was made to Cathcart, neither he, nor the plaintiff, had a lien on the property of the defendant. Both had his body in execution, and the liens of both were suspended. They, therefore, in relation to any rights which they could acquire by an assigement, were in æquali jure, neither, could be preferred to the other, in even his visible property. I have heretofore taken it for granted that the assignment to Cathcart excludes the plaintiff from all right of participating in the proceeds of the property so assigned to him, and such is unquestionably the effect of the assignment under the prison Bounds act. But a just respect for the opinion of the estimable judge who tried this cause, has induced me to point out briefly, the reasons why this is so. Ever since the case of Carpenter v. Kennedy, decided at *129 Camden in the Fall of 1799, and reported in the 1st. vol. of Judge Brevard’s manuscript Reports, 22, the Insolvent debtors and Prison bounds acts, have been held to afford relief in two different cases, and to constitute two distinct systems. By the insolvent debtor’s act, the assignment is directed to be made to the suing creditors, or to such other persons as the Court shall direct, in trust for the suitor or suitors, and such other creditors as shall be willing to receive a dividend.— All therefore under it, who are willing to accept a dividend after the discharge of prior liens, would be entitled to share rateubly, the fund or property assigned. The discharge under the insolvent debtor’s act, is a discharge from all the debts or contracts of the insolvent, on which a dividend is accepted ; and to authorize this result, all who claim a dividend must be entitled to a share proportioned to the amount of their respective demands. The prison bounds act directs the assignment to be made to the plaintiff, subject to all prior incumbrances, and “ thereupon the creditor may take possession, and if necessary, sue in his or her own name for the recovery thereof, and the prisoner shall be discharged from confinement.” The effect of this is, to vest, in the plaintiff all the legal estate of the debtor, subject to no trust except that of discharging with the property assigned, prior incum-brances. The discharge too, is only from confinement in that case, and according to my view of the law, only from that process of execution. It is hence clear, that as the assignment is to the plaintiff in execution, without any trust for the benefit of other creditors, who have no prior incumbrances, and as the rights of the plaintiff in execution, are alone affected by the order for discharge, that he alone is entitled to the benefits arising or resulting from the assignment. It now only remains to be enquired whether the defendant’s act in making the assignment to Cathcart, alone and at the time he did, was voluntary or by legal compulsion, it was done, it is true, under process of execution, and to be relieved from it; but there was no necessity that he should have made the assignment *130 to him. alone, or that it should have been made before that to Mrs. Walker. In each of these respects it was as freely voluntary, as if it had been made before he was arrested. For he might have applied for a discharge from both executions at the same time, and made to both a joint assignment,- or he might have delayed his assignment to Cathcart, until the day on which he purposed to assign to the plaintiff, and made to each, a simultaneous assignment. For he was not arrested under Cathcart’s ca. sa., until he had been nearly a month in execution to the plaintiff. He had therefore more time to delay an assignment in Cath-cart’s case, than he had in that of the plaintiff. There was no legal necessity that he should assign as he did. In the state in which things were after both ca. sa's. had been served upon him, he could prefer neither : he must assign to both, unless one should refuse to accept the schedule and assignment and dispute the truth of the former; in such a case, he might be made discharged from the execution of the one who was willing to accept, and the assignment must be made to him. In this case, the defendant did not think proper to tender his schedule to the plaintiff, until he had assigned it to another creditor, Cathcart; it was then worthless to her, and is an undue preference of another creditor to her prejudice.
I come now to consider whether the recovery of the plaintiff was such an one, as in which the defendant was not entitled to the benefit of the Prison bounds act. It provides inter alia that no prisoner shall be discharged “if he or she is confined on account of wilful maihem or wilful and malicious trespass.” The recovery in this case, is an action of trespass on the case for malicious prosecution ; and it is lienee contended, that the prisoner is confined on account of wilful and malicious trespass. The word “trespass” when used in legal parlance, is always understood in its technical sense to be, a trespass with force and arms, unless it is qualified witli the words “on the case.” There would therefore be no difficulty in saying, that the plaintiff’s recovery was not with *131 in the description of “ wilful and malicious trespass,” even if the point was now for the first time to be adjudicated; but the cases of Walking v. Jennings, 1 M’C. 10, Bamfield v. Ballard, 2 M’C. 183, and Baker & Knight, 3 M’C. 80, are decisions of our own Courts upon the very point now in question, and together constitute so clear an exposition of the legislative meaning in the words now under consideration, that it can be only necessary to refer to them, point out their application, and conclude in conformity to the rule established by them. The first, the case of Walking v. Jennings, is an analogous case to the one now in hand, they both belong to the same family, trespass on the case, and are both for an injury to the plaintiff consequent upon the malice of the defendant. It was an action of slander, for words spoken of the plaintiff: it was held that the defendant was entitled to the benefit of the act. The second Bamfield v. Ballard was a recovery in an action for assault and battery, in which it was held that although it was technically a trespass, yet to deprive the defendant of the benefit of the act, it must amount in the class to which that action belonged, to wilful mailiem. The recorder in speculating upon the probable meaning of wilful and malicious trespass, does suppose that these words might include malicious prosecutions : but this was a mere obiter dictum of a most enlightened judge, and cannot therefore be regarded as authority, for I have no doubt that if the point had been before him, and his learning and talent had been applied to its investigation, he would liave discharged the conjecture which then presented itself to his mind, as too slight to found any conclusion upon. The third and last case, Baker ads. Knight, was trespass for shooting the plaintiff’s slave, in it the Court give a definition to the terms “ wilful and malicious trespass,” which confines them to a solitary class of cases, which would amount to wilful and malicious mischief, under the Stat. of 22 and 23 of Car. 11, C. 7. The defendant in this case is not within the class of cases to which this definition applies the words of the act, and this objection to his discharge must be overruled.
*132 The question whether the defendant’s schedule is true or false, is one purely of fact, and ordinarily the decision of the jury upon it would not be subjected to a re-examination here. But this case blends with the question of fact, some questions of law which deserve consideration. Before proceeding to examine them, it will be necessary to make a remark or two, in relation to that part of the case relating to the house-hold furniture, which is altogether a matter of fact. The plaintiff’s counsel with great good feeling, disclaims any wish to compel (if he could do so) the defendant to embrace in his schedule, the clothing of his dead wife and children. Laying this, therefore, out of the consideration, he contends, that the proof authorizes the conclusion that the defendant is the owner of some glass ware, not embraced in the schedule. On looking into the evidence, it appears, from the testimony of one witness for the plaintiff, and another, for the defendant, that the defendant, shortly before his arrest, packed up, and sent away, some glass ware. This uncon-tradicted fact falsifies the defendant’s schedule, and the jury had no right, in its despite, to find for the defendant. The fact, that the wife of the defendant on her death-bed, requested that the glass-ware should be sent to her relatives, to keep for her children, may be, and I have no doubt is so; but still that could not divest the defendant of his right of property, nor constitute any reason why, as an insolvent, he should not include it in his schedule.
I will now consider, first, whether the admissions of the defendant, that he owned other property than that contained in his schedule, and paying taxes for the same, was evidence to show that he had title thereto? That the admissions of the defendant, arc usually the best evidence of his having title, that we resort to, in a case like the present, is too clear to admit of a doubt. For, in such a case, we can only know his property from the fact of possession, or that he claims title thereto. If it were otherwise, how could the plaintiff falsify his schedule? the de *133 fendant has in his possession all his muniments of title, and by simply withholding them from the plaintiff, he could, if the rule was as is supposed, secure his enlargement, by assigning any part of his estate, as the whole of it. In 2 Stark. on Ev., 29, it is said, “ It is a most general and extensive rule, that all a man’s acts and declarations shall be admitted in evidence, whenever they afford any presumption against him : for it is to be presumed he acted or spoke consistently with his knowledge of the truth.” Under this rule the evidence was properly admissible, and the jury were to judge of the effect of it, and if it satisfied them that the defendant was the owner of the property to which his declarations pointed, they ought to have been advised to find accordingly. It is true, it was not conclusive, that he had title, but was enough to cast on him the Onus of shewing that he had no title thereto. This was, perhaps, done, in relation to the Florida land, by his declaration to Gil-lam, upwards of a year ago, that he had disposed of his estate in Florida. This was an after declaration, but was not objected to, and the jury might, if they had believed it to be true, have found for the defendant. The fact of paying taxes for property, as his own, and not as another’s, is also admissible evidence, to shew a title in the defendant, under the rule which I have stated. It is a less satisfactory kind of evidence than the defendant’s own admissions: for it may be, that having another’s property in his possession, he paid for it as his own. If the claim was to establish his right against a third person, it would, as the presiding judge said, be no evidence of title in him; that as against himself, it is an act of his own, creating a presumption that he was the owner of the property for -which he paid taxes. I do not perceive that the effect of this presumption, in relation to the land in Beaufort or the town lot in Camden, was at all obviated or rebutted by the testimony adduced by the defendant. The papers given in evidence, shewed that other persons than the defendant, many years ago, had title thereto ; but they do not shew *134 that they now have it. For any thing which ap~ pears, the papers given in evidence by the defendant, to shew title in another, may be parts of the chain of title, to himself. The question in relation to the negroes sold by sheriff Carwile, under execution to Abram D. Jones, and by him permitted to return to, and remain in the possession of Briggs for three years, is not entirely free from difficulty. It is true, Briggs’ title was divested by that sale ; but still the fact of his retaining the possession for so long a time unexplained, raises the presumption, either that he had reacquired title, or that the purchase was in trust for him. In either of these points of view, the property ought to have been included in his schedule. Where the vendee of personal property is a creditor of the vendor and permits him to retain possession after an absolute sale, it is evidence of fraud per se and cannot be explained. (Smith v. Henry, decided at this term.) I think this case must depend on the rule settled by that case. At all events, unless explained, Briggs possession of the slaves for three years, was evidence of the title thereto, on which the jury might have found the property to be his.
Ante i6,
The motion for a new trial is granted on the 2nd, 3rd and 5th grounds of objection to the defendant’s discharge.
Johnson J. concurred.
Harper, J. absent.